UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

BIG CAT RECORDS, LLC,                              :          07 Civ. *8161 (BSJ)*

           Plaintiff,                              :

      -against-                                    :          **ORDER TO SHOW CAUSE**

La FLARE ENTERTAINMENT, LLC,                   :

          Defendant.                           :
-----------------------------------------------------------X

       Upon the affidavits of Thomas Silverman sworn to on the 17th day of September, 2007,

Marlon Rowe and Stewart L. Levy, both sworn to on the 18th day of September, 2007, the

exhibits annexed thereto; upon the memorandum of law dated September 18, 2007; and upon the

copy of the summons and complaint annexed hereto, it is

       ORDERED, that the above named defendant LaFlare Entertainment, LLC ("Defendant")

show cause before a motion term of this Court, at Room *18B* United States Courthouse, 500

Pearl Street, New York, New York on _*Sept. 21*_, 2007, at _*10:00*_ o'clock in

the _*fore*_noon thereof, or as soon thereafter as counsel may be heard, why an order should not

be issued pursuant to 28 U.S.C. §§ 2201, 2202 and Rule 57 of the Federal Rules of Civil

Procedure scheduling an expedited hearing in connection with plaintiff Big Cat Records, LLC's

("Plaintiff") request for a declaratory judgment that seeks an order:

      (a) confirming Plaintiff's ownership rights in certain sound recordings, as described

in the complaint; and

      (b) enjoining Defendant from commencing an action for willful copyright

infringement against Plaintiff based on Plaintiff's commercial exploitation of such sound

recordings; and it is further

ORDERED that, personal service of a copy of this order and the accompanying papers annexed hereto upon attorneys for defendant LaFlare Entertainment, LLC, at their place of business, Pryor Cashman LLP, 410 Park Avenue, New York, New York 10022, shall be deemed good and sufficient if made on or before September _19_, 2007 by hand delivery.

Dated:    New York, New York
          September _18_, 2007

                                        U.S.D.J.  9/18/07

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

BIG CAT RECORDS, LLC,                          :        07 Civ.

         Plaintiff,                          :

      -against-                               :        **AFFIDAVIT OF**
                                   **STEWART L. LEVY, ESQ.**

La FLARE ENTERTAINMENT, LLC,                   :

         Defendant.                          :
-------------------------------------------------------------X

STEWART L. LEVY, being duly sworn, deposes and says:

1. I am a member of the firm of Eisenberg Tanchum & Levy, the attorneys for plaintiff Big Cat Records, LLC. ("Big Cat Records").

2. This affidavit is submitted in support of Big Cat Records' request for a declaratory judgment finding that Big Cat Records' contemplated release of certain recordings embodying the performances of the artist Radric Davis, professionally known as "Gucci-Mane," will not constitute an infringement of Mr. Davis' rights in those recordings or the musical compositions contained therein.

<u>Relief Requested</u>

3. Big Cat Records moves for the relief requested by order to show cause because Gucci-Mane, through his attorneys, has notified Big Cat Records that such release will constitute acts of willful copyright infringement for which Gucci-Mane will seek damages. This threat has had a debilitating effect upon Big Cat Records' projected release on September 25, 2007 of a new album of Gucci-Mane recordings.

4. Big Cat Records finds itself in the proverbial position of being between Scylla and Charybdis. Big Cat Records has invested hundreds of thousands of dollars in the release of this Gucci-Mane album (see accompanying affidavit of Marlon Rowe, owner and president

of Big Cat Records, paragraph 32) and can ill afford to scrap the album. On the other hand, the threat of litigation alleging willful copyright infringements is real and has a chilling effect on Big Cat Records' plans.

<u>Synopsis of Dispute</u>

5.  As more fully discussed in the complaint (which together with the summons is annexed hereto as Exhibit A) and the accompanying affidavits of Mr. Rowe and Tom Silverman, the d chief executive officer of Tommy Boy Entertainment, the gravamen of this dispute is whether Big Cat Records' rights to commercially exploit recordings embodying Gucci-Mane's performances terminated when the term of the joint venture agreement into which Gucci-Mane, through his loan-out corporation, La Flare Entertainment, LLC ("La Flare"), entered with Big Cat Records (the "2005 Joint Venture Agreement") (annexed hereto, with its amendment, as Exhibits B and C) ended on November 16, 2006 by virtue of an agreement into which Big Cat Records entered with Atlantic Recording Corporation. ("Atlantic")(the "Atlantic/Big Cat Agreement", annexed hereto as Exhibit D).

6.  The Atlantic/Big Cat Agreement is silent on the above question, providing only that as of November 16, 2006 "Big Cat … waives any and all rights it may have under the Big Cat Artist Agreement [i.e., the 2005 Joint Venture Agreement] or otherwise to the recording services of Artist, and neither La Flare nor Artist [i.e., Gucci-Mane] shall have any further obligation to record, produce or deliver recordings to Big Cat." (paragraph 1 of Exhibit D).

Plaintiff Big Cat Records' Refutation of Defendant 's Position -Big Cat's Commercial
Exploitation of Unreleased (and possibly even already released) Gucci-Mane
Recordings Does **NOT** Constitute Copyright Infringement

7. Annexed hereto as Exhibits F and G are copies of lawyers' letters between Don Zakarin, who

   represents Gucci-Mane and his company, La Flare, and me.

8. Mr. Zakarin's letter of September 7, 2007 (Exhibit G) threatens Big Cat Records with claims

   of willful infringement of Gucci-Mane's copyrights in certain master recordings and musical

   compositions should Big Cat Records proceed with its plans to release a new Gucci-Mane

   album on September 25, 2007.

9. Mr. Zakarin, in that letter, as well as in an earlier one to Big Cat Records dated August 24,

   2007 (Exhibit E), rests his argument for copyright infringement on two points, both of them

   misguided:

   a. Mr. Zakarin argues that when the joint venture agreement terminated, the vehicle
      through which Big Cat Records could distribute and otherwise commercially
      exploit recordings which Gucci-Mane had made during the term of the venture
      also ceased to exist. (See, Mr. Zakarin's August 24th letter where he states:
      "Indeed, by virtue of the Big Cat/Atlantic Agreement, which specifically provides
      that the term of the 2005 Joint Venture Agreement was terminated effective as of
      November 16, 2006, it is arguable that Big Cat no longer has any right to
      distribute any recordings of Gucci Mane since its sole right to distribute was
      provided pursuant to the 2005 Joint Venture Agreement and the termination of the
      term of such agreement necessarily terminated its distribution rights.")

      i. Comment: Mr. Zakarin ignores the fact that the 2005 Joint Venture

         Agreement, as amended June 3, 2005 (copies of which are annexed hereto

         as Exhibits B and C), assigned to Big Cat Records an undivided fifty

         (50%) percent interest in "all Master Recordings by Artist [i.e., Gucci-

         Mane]". As discussed in greater detail in the accompanying memorandum

of law, the distribution of assets once a partnership or joint venture terminates, is governed by the terms of the agreement between the parties to such joint venture agreement. Therefore, in this case, upon termination of the 2005 Joint Venture Agreement, Big Cat Records became the owner of an undivided one-half (1/2) interest in of the master recordings which had belonged to the joint venture during the term of the 2005 Joint Venture Agreement. Moreover, it is a basic tenet of copyright law that a co-owner of a copyright, such as Big Cat Records, with respect to the Gucci-Mane recordings at issue, cannot be guilty of infringing those copyrights.

ii. Mr. Zakarin further ignores the fact that Gucci-Mane, as well as Atlantic, the company for which Gucci-Mane now records, were aware that as of November 16, 2006 Big Cat Records, in addition to two albums of Gucci-Mane performances which Big Cat Records had released to the public in 2005 and 2006, had in its possession additional Gucci-Mane recordings, recordings for which Big Cat Records had paid the cost of production. (see Rowe Aff. Paras.9 and 17). Notably, Atlantic's attorneys drafted the Atlantic/Big Cat agreement (see Tom Silverman Aff. Para. 9), as to which both Gucci-Mane and La Flare were signatories. Had Gucci-Mane and La Flare wished to preclude Big Cat Records from, in the future, commercially exploiting Gucci-Mane's unreleased recordings, provisions should have been made for such preclusion in the Atlantic/Big Cat Agreement. Since no such provision exists, any ambiguities concerning

such a restriction upon Big Cat Records, must be interpreted against the position now espoused by Gucci-Mane and La Flare.

iii.    Finally, Mr. Zakarin ignores the fact that ten (10) months have elapsed from the date of the Atlantic/Big Cat Agreement, during which time Big Cat Records has continued, without objection from Gucci-Mane or any other entity, to commercially exploit its two previously released albums of Gucci-Mane material. If, as Mr. Zakarin suggests, the termination of the 2005 Joint Venture Agreement also terminated the vehicle by which Big Cat Records could distribute even its already released product, then Gucci-Mane's acquiescence in such distribution constitutes an act of estoppel.

b.    Mr. Zakarin argues that since some, if not all of the musical compositions contained on the previously unreleased recordings by Gucci-Mane which Big Cat Records intends to commercially exploit later this month have never been recorded or released, Gucci-Mane retains the right of "first use." Thus, according to Mr. Zakarin, "any release of recordings embodying compositions written by Gucci Mane that require a first use license are unlicensed and Big Cat has no right to manufacture and distribute such recordings. Indeed, beyond being a violation of La Flare's contractual rights, it is copyright infringement." (September 7th letter – Exhibit G).

Comment: Mr. Zakarin ignores the fact that one of the assets of the now defunct joint venture is the requisite publishing licenses granted to the joint venture by La Flare. Thus, in paragraph 16(a) of the 2005 Joint Venture Agreement, and again in paragraph 2 of the June 3, 2005 amendment, La Flare grants to Big Cat Records "all necessary assignments of copyrights, mechanical licenses,… and other information required to manufacture, market, distribute and sell records" including the unreleased Gucci-Mane recordings jointly owned by Big Cat Records and La Flare. (Exhibit B).

<u>Conclusion</u>

10. This case is suitable for the procedural remedy of a declaratory judgment. It presents an actual case and controversy, and a party, Big Cat Records, which clearly has standing given the enormous damages it faces based upon what it decides to do with the new album.

11. This action has been brought on by order to show cause due to the time exigencies of an imminent release of the contested album, and in accordance with the provisions of Rule 57 of the Federal Rules of Civil Procedure which permit the court to "order a speedy hearing of an action for a declaratory judgment and [to] advance it on the calendar."

12. My office did not receive Mr. Zakarin's letter in which he threatened to commence copyright infringement proceedings (Exhibit G), until after the close of business Friday, September 7, 2007. As a result, my client could not review it or discuss its contents with me until Monday, September 10, 2007. Almost immediately a decision was made to apply to this court for relief. However, the intervention of Jewish High Holidays on Thursday and Friday, September 13 and 14, which I observe, delayed a response. Plaintiff is, therefore, filing this application in a timely manner.

13. Plaintiff Big Cat Records has made no previous application for the relief requested herein.

STEWART L. LEVY

Sworn to before me this
17th day of September, 2007

Notary Public

JAMES E. DOHERTY
Notary Public, State of New York
No. 02DO5050294
Qualified in New York County
Commission Expires October 10, 20__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

BIG CAT RECORDS, LLC,                               :          07 Civ.

         Plaintiff,                          :

        -against-                             :          **AFFIDAVIT OF**
                                                               **THOMAS SILVERMAN**
La FLARE ENTERTAINMENT, LLC,                        :

        Defendant.                           :
-----------------------------------------------------------------X

STATE OF NEW YORK        )
                        ) SS.:
COUNTY OF NEW YORK    )

     THOMAS SILVERMAN, being duly sworn, deposes and says:

1.  I have personal knowledge of all the facts set forth in this affidavit and am competent to testify to the truth thereof if called upon to do so.

2.  I have been in the record business for twenty nine (29) years. During that time I have overseen the careers of such performers as Queen Latifah, Naughty By Nature, and De La Soul, been an officer of Warner Bros. Records, and served various trade associations including the Record Industry Association of America, the American Association of Independent Music, the National Association Record Merchandisers, the Sound Exchange and the National Association of Independent Record Distributors and Manufacturers. I am currently the chief executive officer of Tommy Boy Entertainment, a New York – based company engaged in the business of, among other things, producing, distributing and otherwise commercially exploiting the recorded musical performances of artists.

3. Since 2005 Tommy Boy Entertainment has sold, through an arrangement which it has with ADA, a large distribution company, owned by Warner Bros. Music, phonorecords belonging to Big Cat Records, LLC ("Big Cat Records"), a small Atlanta-based company.

4. During that time I have also served as a consultant to Big Cat Records.

5. In the summer of 2006, I represented Big Cat Records in negotiations with the Atlantic Recording Company ("Atlantic") after Atlantic expressed a desire to acquire the rights to the recording artists services of Radric Davis, professionally known as "Gucci-Mane" (hereinafter referred to as "Gucci-Mane" or "Artist").

6. Big Cat Records discovered Gucci-Mane and, with the help of Big Cat Records and the commercial success of two albums and related singles of Artist's recordings released by Big Cat Records, had established himself as a significant recording artist.

7. Atlantic was fully aware of Big Cat Records' prior record releases embodying Gucci-Mane's performances. In fact, the success of those releases is presumably the reason for Atlantic wishing to acquire the rights to Gucci-Mane's recording artist services.

8. Nor was it a secret that Gucci-Mane had made other recordings paid for by Big Cat Records and created for future release and commercial exploitation by that company.

9. The outcome of those negotiations was an agreement, drafted by Atlantic's attorneys, dated November 16, 2006, into which Atlantic entered with Big Cat Records. A copy of that agreement is annexed hereto as Exhibit D.

10. The agreement was also signed by La Flare Entertainment, LLC, Gucci-Mane and other companies associated with him.

2

11. During the course of the next ten (10) months, until August, 2007, when I received a letter dated August 24, 2007 from an attorney claiming to be the attorney for Gucci-Mane and La Flare Entertainment (a copy of which is annexed hereto as Exhibit E), neither Gucci-Mane, La Flare Entertainment nor Atlantic ever objected to Big Cat Records commercially exploiting the recordings of Gucci-Mane.

_____
THOMAS SILVERMAN

Sworn to before me this
17th day of September, 2007

_____
Notary Public

EUGENE D. MASSON
Notary Public, State of New York
No. 02MA5034118
Qualified in New York County
Commission Expires Oct. 3, 2008

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------X
BIG CAT RECORDS, LLC,                    :        07 Civ.

        Plaintiff,                    :

      -against-                        :        **AFFIDAVIT OF**
                                                  **MARLON ROWE**
La FLARE ENTERTAINMENT, LLC,              :

        Defendant.                   :
------------------------------------------------X

STATE OF GEORGIA      )
                     ) SS.:
COUNTY OF _____  )

     MARLON ROWE, being duly sworn, deposes and says:

1.    I am the owner and president of Big Cat Records, LLC. ("Big Cat Records") I have personal knowledge of all the facts set forth in this affidavit and am competent to testify to the truth thereof if called upon to do so.

<u>Background of Big Cat Records</u>

2.    In 1998 I established a small record company in Atlanta, Georgia specializing in the development of artists in the rap and urban genres of music.

3.    I named the company after my nickname, "Big Cat."

4.    Since that time, Big Cat Records has released records by approximately ten (10) artists, experiencing various degrees of success, and being chosen by the record industry magazine, <u>Billboard</u>, as one of the "Top 15 R&B and Hip Hop Independent Labels of 2005."

## Big Cat Records and Gucci Mane

### The Deal

5.    Big Cat Records' biggest success to date by far has been the recordings which we have released featuring the performances of Radric Davis professionally known as "Gucci-Mane."

6.    In 2004 I became aware of Gucci-Mane, who had developed a small following in clubs in the Atlanta vicinity, but who did not have a deal with a record company and was virtually unknown outside Georgia.

7.    In or about January, 2005 Big Cat Records entered into an agreement with what Gucci-Mane said was his corporation, La Flare Entertainment, LLC, pursuant to which we formed a joint venture to distribute world-wide Gucci-Mane's recordings. (the "Agreement"). A copy of the Agreement is annexed hereto as Exhibit B.

8.    The intent of the Agreement was for Gucci-Mane to create, at his own expense, recordings of his performances, and for Big Cat Records to use its expertise, as well as funds, to distribute, market, and promote the records, as well as Gucci-Mane as an artist.

9.    When Gucci-Mane and his company, La Flare Entertainment, LLC, were unable to meet their commitment to fund his recordings, Big Cat Records stepped in with the financing.

10.    In recognition of the added burden assumed by Big Cat Records, the parties agreed to amend the Agreement so that: (a) Big Cat Records was given the option to commercially exploit up to four albums of recordings embodying the performances of Gucci-Mane (an increase of two albums from the terms set forth in the Agreement);

and (b) Big Cat Records was assigned an undivided fifty percent ownership interest in all the recordings (as opposed to a license of the product which was provided for in the Agreement). A copy of the June 3, 2005 amendment to the Agreement is annexed hereto as Exhibit C.

<u>Big Cat Records' Success With Gucci Mane</u>

11.  On May, 25 2005, Big Cat Records released to the public its first recordings by Gucci-Mane. Both the singles from the album, "Icy," and "Go Head," and the album itself, entitled, "Trap House," earned critical claim and enjoyed sales success. The album has sold more than 150,000 copies and "Icy" remained on the <u>Billboard</u> charts of best selling records for almost eight weeks straight.

12.  In October, 2006 Big Cat Records followed up the success of "Trap House" with a second album containing Gucci-Mane's performances, this one entitled, "Hard To Kill."

13.  By the time of the release of the second album, Gucci-Mane had attracted the nationwide attention of both consumers and other record companies.

14.  One such record company, Atlantic Recording Corporation ("Atlantic"), a member of the Warner Bros. Music family of companies, expressed interest in acquiring the rights to Gucci-Mane's recording artist services.

15.  Negotiations ensued between Big Cat Records and Atlantic, at which Big Cat Records was represented by Tom Silverman, the chief executive of Tommy Boy Entertainment, the distributor of Big Cat Records' product, and the person who, based upon his long years of experience and success in the record industry, acts as a consultant for my company.

16.     The result of the negotiations was an agreement dated November 16, 2006 between Big Cat Records and Atlantic which terminated Gucci-Mane's obligation to make further recordings under the Agreement. A copy of this agreement is annexed hereto as Exhibit D.

<u>Atlantic Records Seeks to Acquire Unreleased Gucci-Mane Recordings</u>

17.     Atlantic was aware at the time of the negotiation of the November 16, 2006 agreement that not only had Big Cat Records commercially released two albums of Gucci-Mane recorded material, but that Gucci-Mane, at Big Cat Records' expense, and in Black Cat Records' own recording studio, had recorded other tracks for use in upcoming albums to be released by Big Cat Records.

18.     At no time during the negotiations did Atlantic request, much less demand, that Big Cat Records cease its sale of the two Gucci-Mane albums which had already been released or refrain from exploiting as yet unreleased tracks created by Gucci-Mane for Big Cat Records prior to November 17, 2006.

19.     In March 2007, Gucci-Mane's recording of the song, "Freaky Gurl," the single from the "Hard to Kill" album (which had been released in 2006), began to get significant airplay, and by the summer, 2007, Gucci-Mane had become an extremely popular artist.

20.     At this point Atlantic made overtures to me about buying Big Cat Records' catalog of Gucci-Mane's recordings, both released and unreleased.

21.     Specifically, on July 25, 2007, I had a telephone conversation with Todd Moskowitz, the president of Asylum, a label imprint owned by Atlantic.

22.    We discussed having Asylum/Atlantic distribute all of Big Cat Records' Gucci-Mane recordings, and Mr. Moskowitz represented that Teddy Coleman, an associate of Gucci-Mane, would be coming to Atlanta to meet with me to discuss future plans for those recordings. He also recommended that, in the meantime, I call Doug Davis, Gucci-Mane's attorney, to discuss this matter further.

23.    Later that day I had a telephone conversation with Mr. Davis in which he acknowledged that Big Cat Records had another two albums of Gucci-Mane's recordings.

24.    On August 2, 2007 I met with Mr. Coleman in Atlanta. At the meeting I played for him five tracks of previously unreleased Gucci-Mane recordings which Big Cat Records intended to put on a third Gucci-Mane album slated for a fall release (the "Third Album").

25.    We also discussed the possibility of Asylum/Atlantic, together with Gucci-Mane, purchasing Big Cat Records' catalog of Gucci Mane recordings. When I suggested a purchase price of one million ($1,000,000) dollars, he countered that perhaps seven hundred fifty thousand ($750,000) dollars "might work," and said that he would convey the counteroffer to Mr. Moskowitz and get back to me as soon as possible.

26.    A week later Mr. Coleman called to tell me that Mr. Moskowitz would be coming to Atlanta to listen to Big Cat Records' catalog of Gucci-Mane's recordings, and discuss in further detail the purchase of that catalog.

27.    Mr. Moskowitz never paid me his promised visit. Instead, I received a letter dated August 24, 2007 from Donald Zakarin, an attorney with the firm of Pryor Cashman,

who claimed to be representing Gucci-Mane and his company, La Flare Entertainment, LLC. A copy of this letter is annexed hereto as Exhibit E.

28.    In that letter, Mr. Zakarin, for the first time, claimed, that Big Cat Records not only might not have the right to continue to sell the two albums of his recordings which had been released prior to November 17, 2006, but that the unreleased recordings of Gucci-Mane, which had been paid for by Big Cat Records and created by him prior to that date, could also not be commercially exploited. Mr. Zakarin concluded his letter by threatening to institute legal proceedings to prevent the release of Big Cat Records' third Gucci-Mane album.

29.    When my attorney, Stewart L. Levy, responded to that letter by refuting Gucci-Mane's assertions, Mr. Zakarin replied with a letter dated September 7, 2007, in which he warned that any attempt by Big Cat Records to commercially exploit previously unreleased recordings by Gucci-Mane, even though paid for by Big Cat Records and created by Gucci-Mane prior to November 17, 2006, would constitute acts of copyright infringement. Copies of Mr. Levy's letter dated August 31, 2007 and Mr. Zakarin's letter dated September 7, 2007, are annexed hereto as Exhibits F and G, respectively.

## Any Delay in Releasing Third Album Will Be Devastating

30.    It is generally known that the record industry is undergoing difficulties caused by changing technologies and consumer behavior. Even with the best product, the business is a risky one, and it is much less profitable than it used to be.

31. Big Cat Records has ascertained that an early fall release of the Third Album is the opportune moment to attract industry and consumer attention and maximize sales and airplay.

32. Big Cat Records has invested nearly a half a million dollars in preparing for the September 25, 2007, release of the Third Album, and has committed additional monies to already formulated marketing and promotion plans.

33. A delay in the release date will not only require duplicative expenditures of time and money, but will significantly harm the commercial viability of the Album since the record industry is extremely time sensitive. An artist remains "hot" for only so long.

34. Moreover, accounts have been solicited to purchase the Third Album, orders taken and shipped, and advertising slots reserved. A recall of the Third Album would be costly and do irreparable damage to the reputation of my company and its distributor.

35. This is especially the case with Gucci-Mane where, it is my understanding, Atlantic will be selling by mid-November, 2007 recordings of his which are in direct competition with Big Cat Records' product.

36. I cannot at this moment say for certain whether Atlantic, perhaps deciding that it is less expensive to crush a small competitor like Big Cat Records through the use of legal threats than to purchase that competitor's catalog of product for a fair price, is behind Gucci-Mane 's sudden attempt to prevent the release of the Third Album.

37. I do know that a delay in that release will cost Big Cat Records hundreds of thousands of dollars and deprive it of popular product which not only generates income, but enhances the reputation and market clout of the company. It would be a retail and

008/009

09/18/2007 TUE 11:34 FAX

consumer embarrassment which would destroy the reputation and value of my company.

38.   Just as devastating, however, would be a lawsuit with its specter of being assessed damages as a willful copyright infringer, including the imposition of legal fees and costs.

39.   While Big Cat Records is confident of the correctness of its position, it simply cannot afford to be a defendant in such a suit.

40.   In the face of this dilemma, whether to be destroyed by scrapping the release of the Third Album or be crippled by expensive litigation, Big Cat Records looks to the court for assistance.

MARLON ROWE

Sworn to before me this
18 day of September, 2007

Notary Public

BRANDY YOUNG
NOTARY
EXPIRES
GEORGIA
JUNE 18, 2010
PUBLIC
COBB COUNTY

C:\APPL\PUB\DOC\02154\Rowe Affidavit rev.doc

8