# EXHIBIT D

**ATLANTIC RECORDING CORPORATION**
1290 Avenue of the Americas
New York, NY 10104

Dated as of: November 16, 2006

Big Cat Records, LLC
c/o Vernon L. Slaughter, PC
1741 Commerce Drive NW
Atlanta, GA 30318

Gentlemen:

Please refer to the agreement, dated as of January 20, 2005, between Big Cat Records, LLC ("Big Cat") and LaFlare Entertainment, LLC ("LaFlare") regarding the recording services of Radric Davis, professionally known as "Gucci Mane" ("Artist") as such agreement may have been at any time modified, amended and/or extended (the "Big Cat Artist Agreement"). The following shall constitute the terms of the agreement between Big Cat and Atlantic Recording Corporation ("Company"), regarding the subject matter described herein. This agreement will not be effective unless and until an agreement granting Company the rights to Artist's exclusive recording services (the "Atlantic Artist Agreement") is fully executed.

1.      **Termination of Big Cat Artist Agreement:**

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and in order to allow Company to enter into the Atlantic Artist Agreement and to fully enjoy its rights thereunder, the term of the Big Cat Artist Agreement shall be deemed to be terminated as of the day prior to the commencement of the term of the Atlantic Artist Agreement (i.e., November 17, 2006) (the "Effective Date"). Accordingly, as of this date Big Cat hereby waives any and all rights it may have under the Big Cat Artist Agreement or otherwise to the recording services of Artist, and neither LaFlare nor Artist shall have any further obligation to record, produce or deliver recordings to Big Cat.

2.      **Advances:**

(a)      In consideration of the release granted herein, Czar Entertainment, Inc. ("Czar") hereby directs Company to pay, and Company hereby agrees to pay, Big Cat the following advances, which advances shall be deducted from the applicable recording funds payable by Company to Czar under the Atlantic Artist Agreement for the relevant committed album:

(i)      With respect to the first album released under the Atlantic Artist Agreement, Three Hundred Thousand Dollars ($300,000), which shall be payable promptly following the full execution of the Atlantic Artist Agreement and this agreement;

35256.3/CZ/11/16/06                                      - 1 -



(ii)     With respect to the second album, if any, under the Atlantic Artist Agreement, One Hundred Thousand Dollars ($100,000), which shall be payable promptly following the commencement of recording of such second album.

(b)     All monies payable to Big Cat hereunder shall be deemed advances recoupable from the "Override Royalty" payable to Big Cat pursuant to paragraph 3 below.

(c)     Czar, LaFlare, So Icey Entertainment, Inc. ("So Icey") and Artist hereby acknowledge and agree that the monies payable to Big Cat hereunder shall be deducted from the relevant recording funds set forth in the Atlantic Artist Agreement, and to the extent any such amounts are not recouped from the Override Royalty payable hereunder, such amounts are advances and fully recoupable against any royalties accruing to Czar's account under the Atlantic Artist Agreement.

## 3.     Big Cat Override Royalty:

Solely with respect to the distribution, sale and other exploitation of masters recorded and delivered to Company and embodied on the first album under the Atlantic Artist Agreement, including, without limitation, videos produced for singles released in connection with such first album, Company shall credit Big Cat's royalty account with the following royalties:

(a)     Subject to the terms and conditions set forth herein and provided that Company commercially releases in the United States the first album delivered to Company under the Atlantic Artist Agreement, Company shall pay Big Cat a royalty of three percent (3%) (the "Override Royalty") with respect to top-line, net sales of such album sold through normal retail channels in the Untied States ("USNRC Net Sales"). Company shall credit Big Cat's royalty account any royalties due to Big Cat hereunder from the first record sold, subject only to the recoupment of all advances paid to Big Cat hereunder. For the avoidance of any doubt, any advances paid by Company to Czar, Artist, La Flare or So Icey in connection with Artist's exclusive recording services shall not be recoupable against the royalties accruing to Big Cat's account hereunder.

(b)     In all other respects the Override Royalty shall be computed, determined, calculated, adjusted and paid in the same manner (e.g., "free goods", definitions of royalty base price and mid-price and budget records, reserves, percentages of sales, foreign sales, etc.) and at the same times as the royalties payable by Company to Czar under the Atlantic Artist Agreement, except that there shall be no escalations applicable to the Override Royalty. A redacted copy of the royalty and accounting provisions set forth in the Atlantic Artist Agreement shall be provided to Big Cat upon Big Cat's written request therefor. For the avoidance of any doubt, the Override Royalty payable hereunder shall not be contingent upon the recoupment status of Czar's account under the Atlantic Artist Agreement.

(c)     The Override Royalty payable to Big Cat with respect to any use or configuration of masters embodied on the first album ("Subject Masters") and each a "Subject Master") other than USNRC Net Sales of such album (e.g., sales of singles, maxi-singles, EPs, multiple record sets, value-added records, audio-visual recordings, electronic transmissions [including without limitation so-called "mastertones" and "permanent downloads"], new

technology formats, sales through military exchange channels, club sales, mid-price and budget records etc.), shall be reduced and adjusted in the same proportions as the royalties payable by Company to Czar are reduced under the Atlantic Artist Agreement.

(d)    With respect to any use of a Subject Master for which Company credits a royalty to Czar which is computed as a percentage of Company's net receipts or net royalties from such use, the Override Royalty payable to Big Cat in respect of such use shall be a fraction of the total receipts credited to Czar therefor under the Atlantic Artist Agreement, the numerator of which shall be the Override Royalty payable to Big Cat for such Subject Master and the denominator of which shall be the applicable aggregate, all-in royalty rate (i.e., Czar's royalty rate inclusive of any royalty payable to Artist, the producer and any other third parties, including, without limitation, the Override Royalty payable hereunder) credited with respect to such Subject Master to Czar's account under the Atlantic Artist Agreement. All Override Royalties payable to Big Cat under this paragraph 3(d) shall in all respects be computed, reduced, determined, calculated and paid in the same manner (e.g., "free goods", reserves, percentages of sales, number of units for which royalties are payable, etc.) and at the same time as the royalties payable by Company to Czar in respect of the applicable Subject Master are computed, determined, calculated and paid under the Atlantic Artist Agreement.

(e)    Czar, La Flare, So Icey and Artist hereby acknowledge and agree that the Override Royalty payable to Big Cat hereunder shall be deducted from any and all monies payable to Czar under the Atlantic Artist Agreement.

4.    **Accounting:**

(a)    Company shall account for and pay directly to Big Cat all portions of the Override Royalty due Big Cat hereunder, if any, in accordance with the terms of this agreement and at the same times as Company is required to pay Artist pursuant to the Atlantic Artist Agreement (currently within ninety (90) days after the expiration of each semiannual period ending the last day of June or December).

(b)    All accountings rendered by Company to Big Cat shall be binding upon Big Cat and not subject to any objection by Big Cat for any reason unless specific written objection by Big Cat stating the basis thereof, is furnished to Company within two (2) years from the date rendered. Big Cat shall be foreclosed from maintaining any action, claim or proceeding against Company with respect to any statement or accounting due hereunder unless such action, claim or proceeding is commenced against Company in a court of competent jurisdiction within three (3) years after the date such accounting is rendered. For purposes of this paragraph 4(b), Company shall be deemed conclusively to have rendered to Big Cat each statement on the date prescribed in the first sentence of paragraph 4(a) unless Big Cat notifies Company otherwise with respect to any particular statement within sixty (60) days after the date that Company is required to render that statement pursuant to the first sentence of paragraph 4(a).

(c)    Big Cat shall have the right to appoint an attorney or a certified public accountant ("CPA"), who is not then currently engaged in an outstanding audit of Company, to examine Company's books and records relating to the sale of records embodying the Subject Masters and other exploitations of the Subject Masters, provided that such examination shall take place at Company's offices during normal business hours, on reasonable written notice,

not more frequently than once in any calendar year and at Big Cat's sole cost and expense. Big Cat shall furnish Company with a copy of the audit report within thirty (30) days after the completion of the applicable audit. The rights granted herein to Big Cat constitute Big Cat's sole audit rights.

  (d)  Notwithstanding the first sentence of paragraph 4(c), if Company notifies Big Cat that Big Cat's CPA is engaged in an examination on behalf of another Person ("Other Examination"), Big Cat may nevertheless have Big Cat's examination conducted by Big Cat's CPA, and the running of the time within which such examination may be made shall be suspended until Big Cat's CPA has completed the Other Examination, subject to the following conditions:

    (i)  Big Cat shall notify Company of its election to that effect within fifteen (15) days after the date of Company's said notice to Big Cat;

    (ii)  Big Cat's CPA shall proceed in a reasonably continuous and expeditious manner to complete the Other Examination and render the final report thereon to the client and Company; and

    (iii)  Big Cat's examination shall not be commenced by Big Cat's CPA before the delivery to Company of the final report on the Other Examination, shall be commenced within thirty (30) days thereafter, and shall be conducted in a reasonably continuous and expeditious manner.

(The preceding provisions of this paragraph 4(d) shall not apply if Company elects to waive the provisions of the first sentence of paragraph 4(c) which require that Big Cat's CPA shall not be engaged in any Other Examination.)

  (e)  Company shall compute the Override Royalty in the same national currency in which Company's licensee accounts to Company for that sale, and Company shall credit those royalties to Big Cat's account at the same rate of exchange at which Company pays or credits Company. For purposes of accounting to Big Cat, Company shall treat any sale made outside of the United States as a sale made during the same six (6) month period in which Company receives its licensee's accounting and payment for that sale. If any licensee deducts any taxes from its payment to Company, Company may deduct a proportionate amount of those taxes from Big Cat's royalties. If any law, government ruling or other restriction affects the amount of the payments which a licensee can remit to Company, Company may deduct from Big Cat's royalties an amount proportionate to the reduction in the licensee's remittances to Company. If Company cannot collect payment in the United States in U.S. Dollars for any foreign sales, Company shall, at Big Cat's request and at Big Cat's expense, deduct from the monies so blocked, and deposit in a foreign depository, the equivalent in local currency of the royalties which would be payable to Big Cat on the foreign sales concerned, to the extent to which Big Cat's royalty account is then in a fully recouped position. All such deposits shall constitute royalty payments to Big Cat for accounting purposes. To the extent possible, Company will allow Big Cat to select the foreign depository referred to in this paragraph 4(e).

5.    <u>Logo</u>

The parties to this agreement hereby acknowledge and agree that none of the records released by Company under the Atlantic Artist Agreement shall include Big Cat's distinctive logo or trademark.

6.    <u>License of Master</u>

Big Cat hereby licenses to Company, on gratis basis, the right to include the master recording entitled "My Chain (Remix)" on the first album released by Company under the Atlantic Artist Agreement and on any other record released by Company in connection with the first album, provided such record consists solely of master recordings embodying the performances of Artist.

7.    <u>Promotional Services:</u>

Asylum Records LLC ("Asylum") hereby agrees to provide radio promotional services, for no fee, to Big Cat solely with respect to the first single, entitled "My Chain", from the album entitled "Hard To Kill" embodying the recordings of Artist's performances, which was released in the United States on or about October 24, 2006 (the "Big Cat Album"). Big Cat hereby acknowledges that such promotional services shall be furnished by Asylum for such period of time as is consistent with music industry standards and practices in the United States respecting the servicing of singles but in no event shall such period of time be longer than three months. Notwithstanding anything to the contrary contained in this paragraph 7, it is understood and agreed that Asylum shall not be required to incur any third party, out-of-pocket costs in connection with the provision of such radio promotional services, and accordingly, Big Cat shall be solely responsible for engaging any third party who may provide additional promotional services in connection with the Big Cat Album (or singles therefrom) and for paying any costs relating thereto.

8.    <u>Notices:</u>

(a)    All notices to Big Cat shall be in writing and may be served upon Big Cat personally or by registered or certified mail, return receipt requested addressed to Big Cat at its address first above written. In the event that Big Cat's address changes so that notices are not sent to the address set forth on page one hereof, Company shall undertake to send a copy of each notice to Big Cat's attorney, Vernon L. Slaughter, P.C., 1741 Commerce Drive NW, Atlanta, GA 30318, but Company's failure to send any such copy shall not constitute a breach of this agreement or impair the effectiveness of the notice concerned.

(b)    All notices to Company shall be in writing and shall be sent postage prepaid by registered or certified mail, returned receipt requested, addressed to Company's address first above written, Attention: Senior Vice President, Business and Legal Affairs.

9.   **Captions:**

The captions and section headings appearing in this agreement are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this agreement.

10.   **Miscellaneous:**

(a)   This agreement sets forth the entire agreement between the parties with respect to the subject matter hereof. No modification, amendment, waiver, termination or discharge of this agreement shall be binding unless signed by the party to be charged. A waiver by any party hereunder of any term or condition of this agreement in any instance shall not be deemed or construed as a waiver of such term or condition for the future, or of any subsequent breach thereof. Company may assign this agreement to: (i) any parent, subsidiary, sister corporation, joint venture partner or affiliate thereof, or other affiliate of Company; (ii) a person acquiring all or substantially all of Company's record-related assets; or (iii) an entity merged into or consolidated with Company. The foregoing shall not prohibit or in any way restrict Company from assigning or licensing any of its rights hereunder in the ordinary course of business. This agreement is personal to Big Cat, and Big Cat shall not have the right to assign this agreement or any of its rights or obligations hereunder. All rights and remedies in this agreement shall be cumulative and none of them shall be in limitation of any other remedy, option or right available to Company or to Big Cat. Should any provision of this agreement be adjudicated by a court of competent jurisdiction as void, invalid or inoperative, such decision shall not affect any other provision hereof, and the remainder of this agreement shall be effective as though such void, invalid or inoperative provision had not been contained herein. Neither party shall be entitled to recover damages or to terminate this agreement by reason of any breach by the other party of its material obligations, unless the latter party has failed to remedy the breach within a reasonable time following receipt of notice thereof. Nothing herein contained shall contemplate or constitute a partnership, joint venture or fiduciary relationship between Big Cat and Company.

(b)   THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF NEW YORK AND ITS VALIDITY, CONSTRUCTION, PERFORMANCE AND BREACH SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE WHOLLY PERFORMED THEREIN. BIG CAT AGREES TO SUBMIT ITSELF TO THE JURISDICTION OF THE FEDERAL OR STATE COURTS LOCATED IN NEW YORK CITY IN ANY ACTION WHICH MAY ARISE OUT OF THIS AGREEMENT AND SAID COURTS SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES BETWEEN COMPANY AND BIG CAT PERTAINING TO THIS AGREEMENT AND ALL MATTERS RELATED THERETO. Nothing contained herein shall preclude Company from joining Big Cat in an action brought by a third party against Company in any jurisdiction, although Company's failure to join Big Cat in any such action in one instance shall not constitute a waiver of Company's rights with respect thereto, or with

respect to any subsequent action brought by a third party against Company. Nothing contained herein shall limit Company's rights to institute suit in jurisdictions other than New York or constitute a waiver of any other remedies available to Company.

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the day and year first above written.

Very truly yours,
ATLANTIC RECORDING CORPORATION

By: _____

ACCEPTED AND AGREED TO:
BIG CAT RECORDS, LLC

By: _____
An Authorized Signatory

ACCEPTED AND AGREED TO
INSOFAR AS THE FOREGOING PERTAINS TO US:

CZAR ENTERTAINMENT, INC.

By: _____
An Authorized Signatory

LAFLARE ENTERTAINMENT, LLC

By: _____
An Authorized Signatory

SO ICEY ENTERTAINMENT, INC.

By: _____
An Authorized Signatory

RADRIC DAVIS p/k/a "Gucci Mane"

ACCEPTED AND AGREED TO
INSOFAR AS PARAGRAPH 7 PERTAINS TO US:
ASYLUM RECORDS LLC

By: _____
An Authorized Signatory

35251.3/C2/11/16/06                    - 7 -

**EXHIBIT E**



# PRYOR CASHMAN LLP

New York | Los Angeles

410 Park Avenue, New York, NY 10022  Tel: 212-421-4100  Fax: 212-326-0806

www.pryorcashman.com

Donald S. Zakarin
Partner

Direct Tel: 212-326-0108
Direct Fax: 212-798-6306
dzakarin@pryorcashman.com

August 24, 2007

VIA FACSIMILE &
CERTIFIED MAIL,
RETURN RECEIPT REQUESTED

Big Cat Records, LLC.
% Vernon L. Slaughter, P.C.
1741 Commerce Drive, N.W.
Atlanta, GA 30318

Big Cat Records, LLC.
2020 Howell Mill Road
#331
Atlanta, GA 30318

VIA FACSIMILE &
FIRST CLASS MAIL

Tommy Boy Entertainment
32 West 18th Street
New York, NY 10011

Alternative Distribution Alliance
72 Spring Street
12th Floor
New York, NY 10012
Att: President

RE:  **Big Cat Records/LaFlare Entertainment, LLC f/s/o Radric Davis,
p/k/a Gucci Mane**

Dear Mr. Slaughter:

This firm represents LaFlare Entertainment, LLC., Radric Davis and So Icey
Entertainment, Inc. (collectively referred to herein as "Gucci Mane").

As you know, LaFlare Entertainment, LLC entered into a joint venture agreement with
Big Cat Records, LLC ("Big Cat") dated as of January 20, 2005, as amended on June 3, 2005
relating to the recording services of Gucci Mane and, pursuant to which, Big Cat obtained co-
ownership of certain master recordings and certain defined distribution rights and obligations
(the "2005 Joint Venture Agreement"). Further, as you know, Gucci Mane, through Czar
Entertainment, entered into an exclusive recording agreement with Atlantic Records, effective as
of November 17, 2006 (the "Gucci Mane/Atlantic Recording Agreement"). Finally, as you also
know, Big Cat entered into an agreement with Atlantic Records ("Atlantic") dated as of
November 16, 2006 which, *inter alia,* provided for the termination of Big Cat's joint venture
agreement with Gucci Mane and the waiver of any and all rights Big Cat had under the 2005
Joint Venture Agreement as well as providing Big Cat with certain advances and override



PRYOR CASHMAN LLP

Vernon L. Slaughter, Esq.; and
Big Cat Records, LLC.
August 24, 2007
Page 2

royalties from the first album to be released by Atlantic under the Gucci Mane/Atlantic Recording Agreement (the "Big Cat/Atlantic Agreement").

We have been advised that, notwithstanding the foregoing agreements, Big Cat intends, on an imminent basis, to manufacture and distribute, through Alternative Distribution Alliance and Tommy Boy Records, master recordings recorded by Gucci Mane other than the specific albums embodying master recordings recorded by Gucci Mane and heretofore released and distributed by Big Cat pursuant to its then existing rights under the 2005 Joint Venture Agreement. Indeed, we have been advised that Big Cat has been seeking to acquire master recordings recorded by Gucci Mane that were never subject to or acquired by Big Cat under the 2005 Joint Venture Agreement and were never delivered to Big Cat for distribution under such agreement and were never authorized to be released by Gucci Mane.

On behalf of Gucci Mane, we hereby are putting Big Cat and any persons or entities through which it may seek to distribute any phonorecords on notice that any attempt to distribute any Gucci Mane recordings other than those recordings that were embodied on the two albums released and distributed by Big Cat pursuant to and during the term of the 2005 Joint Venture Agreement and in any configuration other than in the configuration in which such recordings were released and distributed during the term of the 2005 Joint Venture Agreement is unauthorized and will constitute a conversion of the valuable property rights of Gucci Mane.

To be clear, Big Cat has neither any ownership or distribution rights except as were granted under the now terminated 2005 Joint Venture Agreement and it has no ownership rights to any master recordings other than those that were the subject of the 2005 Joint Venture Agreement. With the termination of that agreement, Big Cat has no remaining distribution rights other than, arguably, with respect to those master recordings that were actually distributed during the term of the 2005 Joint Venture Agreement. Even were one to assume that Big Cat somehow acquired an ownership interest in other master recordings that may have been created by Gucci Mane during the term of the 2005 Joint Venture Agreement, such ownership rights would be joint with Gucci Mane and with the termination of the 2005 Joint Venture Agreement, Big Cat lacks any right to distribute any such master recordings. Furthermore, Gucci Mane, which at the least co-owns such master recordings, does not consent to or authorize any distribution of such recordings.

Accordingly, any attempted distribution of any master recordings not previously released and distributed during the term of the 2005 Joint Venture Agreement would be unauthorized and in violation of our clients' valuable property rights.

Indeed, by virtue of the Big Cat/Atlantic Agreement, which specifically provides that the term of the 2005 Joint Venture Agreement was terminated effective as of November 16, 2006, it



PRYOR CASHMAN LLP

Vernon, L. Slaughter, Esq.; and
Big Cat Records, LLC.
August 24, 2007
Page 3

is arguable that Big Cat no longer has any right to distribute any recordings of Gucci Mane since its sole right to distribute was provided pursuant to the 2005 Joint Venture Agreement and the termination of the term of such agreement necessarily terminated its distribution rights. However, whether or not Big Cat retained any distribution rights at all subsequent to the Big Cat/Atlantic Agreement, it most assuredly had and has no right to manufacture and distribute any phonorecords beyond those that it had manufactured and distributed prior to the termination of the term of the 2005 Joint Venture Agreement. The termination of such agreement effected the termination of its right to distribute any further recordings.

Furthermore, except to the extent provided in the 2005 Joint Venture Agreement, all master recordings recorded by Gucci Mane prior to the commencement of the Gucci Mane/Atlantic Recording Agreement and the copyrights therein are solely owned by Gucci Mane and Big Cat neither has any ownership interest in the physical master recordings or the copyrights therein. Any attempt to exploit any such master recordings constitutes copyright infringement and Gucci Mane will pursue all necessary and appropriate legal action to preserve their valuable copyright rights.

In addition, while we do not represent the interests of Atlantic with respect to this matter, to the extent that any of the master recordings that Big Cat contemplates distributing were recorded at any time subsequent to the commencement of the Gucci Mane/Atlantic Recording Agreement, Atlantic has the exclusive rights to such master recordings pursuant to the terms of its exclusive recording agreement. Accordingly, we believe that any attempted distribution of such recordings (and, indeed, any claim of ownership of any such master recordings) would be in violation of Atlantic's rights, would constitute copyright infringement and would also be contrary to the terms and intendment of the Big Cat/Atlantic Agreement.

We have also been advised that Big Cat has failed to account and pay Gucci Mane any mechanical royalties with respect to any of the phonorecords that it manufactured and distributed pursuant to the 2005 Joint Venture Agreement. Pursuant to the terms of such agreement, the Venture is obligated to pay mechanical royalties at 75% of the applicable minimum statutory rate per selection with a maximum of twice such rate for a two sided single and ten times such rate for an album containing ten songs and eleven times the rate for an album containing eleven songs. Based on the financial records I have reviewed (which reflect all manner of alleged expenses), I see no evidence of any payment by Big Cat of mechanical royalties. On behalf of Gucci Mane, we hereby demand that full and complete accountings be provided and that payment in full of all mechanical royalties be made immediately. In addition, I have been advised that Big Cat's financial records pertaining to its exploitation of Gucci Mane's recordings are substantially inaccurate and claim expenses that it did not incur. Gucci Mane specifically reserves his right to pursue claims respecting his financial rights under the 2005 Joint Venture Agreement.


PRYOR CASHMAN LLP

Vernon, L. Slaughter, Esq.; and
Big Cat Records, LLC.
August 24, 2007
Page 4

Finally, to the extent that any of the recordings that Big Cat contemplates releasing and distributing embody musical compositions that have not heretofore been mechanically licensed, any purported attempt to manufacture and distribute such recordings would constitute a violation of the first use rights of the copyright owner of the compositions. We believe that Gucci Mane wrote and composed, in whole or in part, all of the compositions that he has recorded and that any manufacture and distribution of phonorecords embodying such compositions would therefore infringe our clients' copyrights.

To the extent that Big Cat contemplates manufacturing and distributing only phonorecords that it previously released and distributed under and pursuant to the terms of the 2005 Joint Venture Agreement, upon submission of proof thereof, we will not seek to interdict such action. However, because we are informed that the release and distribution of phonorecords featuring the recorded performances of Gucci Mane is imminent, unless we receive, within ten (10) business days hereof, confirmation that Big Cat and any distributor thereof will refrain from attempting to release and distribute any phonorecords featuring the recorded performance of Gucci Mane other than those previously released and distributed in the configuration previously released and distributed under and pursuant to the terms of the 2005 Joint Venture Agreement, Gucci Mane will take appropriate action to protect his and their valuable rights, including seeking injunctive relief.

Please be advised that the foregoing should not be viewed as a complete recitation of the rights and remedies of Gucci Mane, all of which are specifically reserved.

Sincerely yours,

Donald S. Zakarin

cc.: Warner Music Group *(via facsimile)*
75 Rockefeller Plaza, 31st Floor
New York, NY 10019
Att: EVP and General Counsel

Doug Davis, Esq. *(via facsimile)*
The Davis Firm
7 West 22nd Street, 4th Floor
New York, NY 10010

Mr. Radric Davis *(via facsimile)*
% Doug Davis, Esq.

**EXHIBIT F**

EISENBERG TANCHUM & LEVY

675 THIRD AVENUE

NEW YORK, NEW YORK 10017

—————

(212) 599-0777

—————

TELECOPIER: (212) 599-0770

MICHAEL L. TANCHUM
RICHARD D. EISENBERG
STEWART L. LEVY
——
JAMES E. DOHERTY

ELLIOTT D. HEFLER
LETTY M. TANCHUM
DAVID GREENE
HAROLD GREENBERG
OF COUNSEL

August 31, 2007

**Fax & Mail**
Donald S. Zakarin, Esq.
Pryor Cashman LLP
410 Park Avenue
New York, New York 10022

> Re:   Big Cat Records –w-La Flare Entertainment, LLC furnishing the services
> of Radric Davis professionally known as "Gucci-Mane"

Dear Don:

Your letter of August 24, 2007 to Tommy Boy Entertainment and my client, Big Cat Records, LLC ("Big Cat"), has been referred to me for response.

While I have no intention of engaging in a colloquy with you concerning the myriad points raised in your letter, preferring to leave that, if necessary, to a trier of fact and law, it appears that your allegations are based on either misinformation, faulty logic or a combination of the two. In particular, although you note that the agreement between La Flare Entertainment, LLC ("La Flare") and Big Cat dated January 20, 2005 (the "Agreement") was amended on June 3, 2005 (the "Amendment"), you have either chosen to ignore the terms of the Amendment or have simply not read it.

Paragraph 2 of the Amendment provides that Big Cat shall own "an undivided fifty (50%) percent interest in all of Venture Partner's [La Flare's] right, title and interest in all Master Recordings by Artist [Mr. Davis]."   Paragraph 1 of the Agreement clarifies the meaning of "Master Recordings" when it refers to the purpose of the Agreement being to "'joint venture'" the world-wide distribution of master recordings … of the recording artist, Radric Davis p/k/a "Gucci-Mane." When this language is coupled with the rights granted to Big Cat in the Amendment with regard to multiple albums containing Mr. Davis' performances, it seems clear that the Agreement, as amended, contemplated Big Cat co-owning and commercially exploiting more master recordings than simply those that had been released at the time of the termination of the Agreement.

Donald Zakarin, Esq.
August 31, 2007
Page 2 of 3

Buttressing this conclusion is the fact that there is absolutely no provision in the November 16, 2006 agreement between the Atlantic Recording Corporation ("Atlantic") and Big Cat (the "Atlantic/Big Cat Agreement") to the contrary. If Atlantic had desired to restrict Big Cat's rights to commercially exploit recordings embodying Mr. Davis' performances only to those then released by Big Cat, presumably the Atlantic/Big Cat Agreement, which I am told was drafted by Atlantic's legal department, would have provided as such. That the agreement is silent on this matter is very telling. Indeed, paragraph 1 of the Atlantic/Big Cat Agreement simply states that as of November 17, 2006, Big Cat waives its rights "to the recording services of Artist and neither La Flare nor Artist shall have any further obligation to record, produce or deliver recordings to Big Cat." There is nothing in this language to suggest that this waiver refers to anything other than future recording services or that it intended to restrict Big Cat's right to commercially exploit pre-existing recordings.

Moreover, your assertions that Big Cat has not paid mechanical royalties to Mr. Davis or his publishing entities and has been deficient in its royalty accountings ignores not only the language of the relevant agreement, but the underlying facts. Paragraph 10 of the Agreement imposes upon the "Venture," as opposed to Big Cat (which is defined as the "Company"), the obligation to pay mechanical royalties. The paragraph goes on to state that "Venture Partner shall bear ultimate responsibility for payment of mechanical royalties." Since "Venture Partner" is defined as La Flare Entertainment, LLC, I suggest that any complaints about non-payment of mechanical royalties be taken up with that entity. As for the issue of proper royalty accountings, my client has informed me that it has accounted to your client as required by contract. In addition, contrary to your implication that Big Cat has failed to meet its accounting obligations, it should be noted that your client, La Flare Entertainment, LLC is the entity in contractual breach. In particular, La Flare Entertainment, LLC has not paid for the costs, recording and otherwise, required of it in paragraph 6 of the Agreement. That paragraph states that La Flare Entertainment, LLC "shall be solely responsible for paying all recording costs (including producer advances and fees) and all third-party advances, artist advances and artist royalties payable to Artist and third-parties pursuant to the Artist Agreement." Instead, those costs were advanced by Big Cat which is now seeking to recoup those outlays. I suggest that if your client has questions concerning the accountings which have been provided to it, that it retain a certified public accountant to examine Big Cat's books and records as provided for in the Agreement, instead of having you make scurrilous allegations.

Despite the belligerent tone of your letter, however, I trust that, after having read this letter you and your client will reconsider your position concerning Big Cat. In particular, I expect that you will retract your threats and refrain from interfering with Big Cat's commercial exploitation of its rights in records recorded by Mr. Davis. Any such interference will subject your client to sanctions, including, but not limited to damage claims.

Donald Zakarin, Esq.
August 31, 2007
Page 3 of 3

     Please be advised that the matters set forth in this letter should not be viewed as a complete recitation of the rights and remedies of Big Cat, all of which are specifically reserved.

Very truly yours,

Stewart L. Levy

SLL/md

cc:    Mr. Marlon Rowe
       Mr. Melvin Breeland
       Mr. Tom Silverman
       Gene Masson, Esq.
       Alternative Distribution Alliance

**EXHIBIT G**

# PRYOR CASHMAN LLP

410 Park Avenue, New York, NY 10022   Tel: 212-421-4100   Fax: 212-326-0806

New York | Los Angeles

www.pryorcashman.com

**Donald S. Zakarin**
Partner

Direct Tel: 212-326-0108
Direct Fax:  212-798-6306
dzakarin@pryorcashman.com

September 7, 2007

**VIA FACSIMILE & FIRST CLASS MAIL**

Stewart L. Levy, Esq.
Eisenberg Tanchum & Levy
675 Third Avenue
New York, New York  10017

RE:   **Big Cat Records/LaFlare Entertainment, LLC f/s/o Radric Davis,**
          **p/k/a Gucci Mane**

Dear Stewart:

Thank you for your letter of August 31, 2007.  I have read it with care and have re-reviewed the relevant agreements in light of your letter.  However, that re-review of the agreements has confirmed my views rather than altered my analysis.  By the way, I assure you that prior to sending my letter of August 24, 2007, I had both read the June 3, 2005 Amendment and had not ignored that Amendment.

Indeed, the Amendment forms part of my conclusion that Big Cat has no right to distribute any master recordings other than those that were distributed during the term of the Joint Venture between Big Cat and La Flare.  While it is apparent that you disagree, it may still be worth my taking the time to explain why your client is about to engage in actions in violation of my client's rights and which may also constitute copyright infringement.  Therefore, so that you can properly advise your client (so that if it chooses to persevere with its intended release and distribution of recordings other than those distributed during the term of the Joint Venture and is thereafter confronted with a significant exposure to damages, it will have knowingly acted and assumed the risk), I will further outline my analysis of the relevant contracts.

First, I think that there is no dispute between us that the Joint Venture was established to distribute master recordings recorded by Gucci Mane.  The Joint Venture, not Company and not LaFlare, was the distributor.  Originally, the sole owner of the masters was LaFlare, which would license the masters to Big Cat for distribution on behalf of and by the Joint Venture.  The Amendment (which appears to have been given for no consideration that I can discern, which

**PRYOR CASHMAN LLP**

Stewart L. Levy, Esq.
September 7, 2007
Page 2

raises issues as to its validity) altered this license by assigning to Big Cat an undivided 50% interest in LaFlare's right, title and interest in all master recordings of Gucci Mane.[1]

The Amendment also altered Paragraph 3 of the Agreement (adding an additional option). Thus, pursuant to the Amendment, Big Cat obtained one album for distribution by the Joint Venture and the right, but not the obligation, to option three additional albums. The option rights are plainly limited to the purposes of the Agreement, which was a joint venture to distribute albums worldwide (See Paragraph 1 of the Agreement). This remained unchanged by the Amendment since the Amendment specifically provided that except as amended, the Agreement remained in full force and effect. In other words, the changes effected by the Amendment were to convert license rights in master recordings into an undivided 50% interest in all of LaFlare's interests in the recordings and to add an additional option album.

As I understand it, during the term of the Joint Venture, Big Cat exercised one option and the Joint Venture distributed two albums.

I also think that there is no disagreement between us that the November 16, 2006 Atlantic Agreement with Big Cat ("Termination Agreement") terminated the term of the Big Cat/LaFlare Agreement. You, however, conclude that because the Termination Agreement did not explicitly preclude Big Cat from releasing any additional previously unreleased masters that it might have or might acquire, Big Cat is therefore free to distribute any Gucci Mane recordings it might have or acquire. This is where we plainly disagree.

The Termination Agreement terminated the term of the Big Cat/LaFlare Agreement on November 16, 2006. Thus, the Joint Venture between LaFlare and Big Cat ceased to exist on that date. The stated purpose of the Joint Venture was to distribute Gucci Mane's recordings. While Big Cat was the venture partner obligated to actually do the distribution on behalf of the Joint Venture, the distribution was solely on behalf of the Joint Venture. With the termination of the Joint Venture, Big Cat could not possibly be distributing any further recordings on behalf of the Joint Venture. Its distribution rights terminated with the Joint Venture's termination. Indeed, this is why I stated that it is not clear to me that any right to continue to distribute any previously released recordings survived the termination of the Joint Venture. Any distribution by the Joint Venture would make no sense once the Joint Venture ceased to exist.

Furthermore, as stated in the Amendment, Big Cat had the option, but not obligation, for three more albums beyond the first album. As I stated above, it is my understanding that Big Cat did in fact exercise its first option prior to the Termination Agreement. However, upon the termination of the Joint Venture (by virtue of the termination of the term of the Big Cat/LaFlare Agreement), there no longer were any option rights available to exercise. The option rights were

---

[1] This provision simply assigns and conveys a 50% interest in LaFlare's interest in the master recordings, whatever that interest may have been.

# PRYOR CASHMAN LLP

Stewart L. Levy, Esq.
September 7, 2007
Page 3

solely available and granted under an agreement the term of which had been terminated and which therefore no longer existed.  How then could Big Cat purport to have the right to distribute any additional albums when its option exercise rights ceased to exist?  While Big Cat may have had, by virtue of the Amendment, an undivided interest in 50% of LaFlare's interest in master recordings of Gucci Mane, the termination of the Agreement terminated the Joint Venture's right to distribute any master recordings and terminated Big Cat's option rights.

But let us assume, for the sake of argument, that you believe that, despite the termination of the Joint Venture and the termination of the option rights (which is solely an option for Big Cat to undertake distribution of additional recordings on behalf of the Joint Venture, which is the sole purpose of the Joint Venture), Big Cat somehow still retained the right to option additional albums and the right to distribute such albums, from where do these rights derive?  The Joint Venture no longer exists.  The Agreement conveying these rights has ended.  The option rights no longer exist.  How can option rights that have not been exercised survive the termination of the term of the agreement that provided the option rights?  The right to distribute is solely by the Joint Venture under the terminated Big Cat/LaFlare Agreement.  How does the right to distribute additional albums that were never optioned during the term of the agreement exist after the termination of the Joint Venture on whose behalf such albums would have been distributed?

Moreover, if, somehow, Big Cat nonetheless retained such option and distribution rights provided by the Big Cat/LaFlare Agreement despite the termination of the term of that Agreement and the consequent termination of the Joint Venture, then the retention of those rights would similarly have to be subject to the terms of the Big Cat/LaFlare Agreement that provided such rights, notwithstanding the termination of its term.  While your letter is noticeably silent as to the supposed basis on which Big Cat would be purporting to distribute additional master recordings (and noticeably silent on whose behalf such recordings would be distributed), the only distribution right granted is under the Big Cat/LaFlare Agreement.  The only option right for additional albums is under the Big Cat/LaFlare Agreement.  If the term of that agreement is terminated, such rights cannot exist in thin air.  If such rights somehow continue to exist as to all master recordings made during the term despite the absence of any option exercise (which seems to be your contention), then the distribution right must be in accordance with the contractual terms and limitations of the Big Cat/LaFlare Agreement.

When one thus refers to the Big Cat/LaFlare Agreement, it confirms that your clients have no right to distribute any master recordings other than those previously approved for distribution by LaFlare and previously distributed.  Paragraph 9 specifically provides as follows:

> "Company [Big Cat] shall consult with Venture Partner [LaFlare] on all marketing/promotion/budgetary decisions, provided, in the event of a dispute, Company's good-faith decision shall prevail.  **Venture Partner [LaFlare] shall have creative control with respect to: A&R, artwork, video concept and**

**PRYOR CASHMAN LLP**
Stewart L. Levy, Esq.
September 7, 2007
Page 4

> **storyboard and musical direction of Artist."**

It is indisputable that LaFlare was not consulted about any of the marketing, promotion and budgetary decisions regarding the master recordings Big Cat is apparently intending to release and distribute. More critically, LaFlare has not had any input, let alone been afforded creative control, over the A&R, artwork or musical direction relating to these master recordings. Pursuant to the Big Cat/LaFlare Joint Venture, LaFlare has absolute control over A&R and artwork. Indeed, it is my understanding that many of the recordings were simply works in process and never intended by my client for release and distribution. I have no doubt that this is precisely why the Big Cat/LaFlare Agreement vested exclusive control in LaFlare over the determination of what recordings would be released and distributed and what recordings would not be released and distributed.

Accordingly, it is completely clear that the Big Cat/LaFlare Agreement explicitly provides that no recordings may be released and distributed without our client's approval and consent as to the recordings and as to the artwork. It is indisputable that LaFlare has not consented or approved of any of the recordings or any artwork for the contemplated album. Thus, your client's contemplated distribution will be in violation of LaFlare's explicit and exclusive rights. Also, any release and distribution of recordings that were merely works in process would be damaging to our client's career and would therefore give rise to a further claim for damage caused to his career and reputation by virtue of such unauthorized and improper release and distribution of recordings.

Furthermore, it is our understanding that at least some of the recordings embody compositions that have not previously been recorded and released. As such, a first use license is required from the author(s). In all cases, it is our understanding that Gucci Mane is an author. The Amendment provides, on an *in futuro* basis, that LaFlare will deliver mechanical licenses for compositions. However, upon termination of the term of the Big Cat/LaFlare Agreement, this obligation to issue mechanical licenses also terminated. Thus, any release of recordings embodying compositions written by Gucci Mane that require a first use license are unlicensed and Big Cat has no right to manufacture and distribute such recordings. Indeed, beyond being a violation of LaFlare's contractual rights, it is copyright infringement.

Again, to the extent that you conceive that the obligation of LaFlare to deliver mechanical licenses for Gucci Mane recordings made during the term after the termination of the term of the Big Cat/LaFlare Agreement survived (a position that appears illogical to me), then perforce all other obligations pertaining to such masters under the Big Cat/LaFlare Agreement must similarly remain. Consequently, the violation of LaFlare's rights outlined above is indisputable.

# PRYOR CASHMAN LLP

Stewart L. Levy, Esq.
September 7, 2007
Page 5

Finally, as I also stated in my prior letter, while you seem to focus on the absence of a restriction on releasing and distributing further recordings in the Termination Agreement, I believe that the nature of the Big Cat/LaFlare Agreement (a joint venture agreement for the distribution of recordings and not a standard recording agreement) necessarily meant that the termination of its term ended the joint venture and ended any right to option and distribute any further recordings. Furthermore, Atlantic paid Big Cat an override in connection with the termination, a payment that would make no sense if Big Cat was intended to retain the right to distribute a potentially unlimited number of additional recordings. The logic and intendment of the Termination Agreement was to terminate any future rights of Big Cat to the recorded services of Gucci Mane and to distribute any additional recordings. The termination of the Joint Venture effectively accomplished that end.

The foregoing is simply an outline of the issues that I believe your letter overlooks and is not intended to be a complete description of the reasons for my conclusions. However, as I indicated above, I have provided this outline to you so that you can effectively advise your client about the economic risks it is about to undertake, risks that I assume will include indemnifying Tommy Boy and any distributor for the losses that they may suffer as a result of having distributed recordings in violation of LaFlare's rights and, quite likely, in violation of Gucci Mane's copyright rights. If your client elects to proceed, then we reserve all of our client's rights and may proceed to seek a judicial determination of our client's rights and appropriate damages for violation of those rights.

Sincerely yours,

Donald S. Zakarin

cc.:　Warner Music Group *(via facsimile)*
　　75 Rockefeller Plaza, 31st Floor
　　New York, NY 10019
　　Att: EVP and General Counsel

　　Doug Davis, Esq. *(via facsimile)*
　　The Davis Firm
　　7 West 22nd Street, 4th Floor
　　New York, NY 10010

　　Mr. Radric Davis *(via facsimile)*
　　% Doug Davis, Esq.