Donald S. Zakarin (DZ-6355)
Anika Lewis (AL-2005)
PRYOR CASHMAN LLP
410 Park Avenue, 10th Floor
New York, New York 10022-4441
(212) 421-4100

Attorneys for Defendant

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- X

| | |
|---|---|
| BIG CAT RECORDS, LLC, : | 07 Civ. 8161 (BSJ) |
| : | |
| Plaintiff, : | |
| : | |
| -against- : | **AFFIRMATION OF** |
| : | **DONALD S. ZAKARIN** |
| La FLARE ENTERTAINMENT, LLC, : | |
| : | |
| Defendant. : | |

-------------------------------------------------------- X

Donald S. Zakarin, hereby affirms under penalty of perjury as follows:

1.      I am a member of Pryor Cashman, LLP, attorneys for La Flare Entertainment,

LLC. ("La Flare") and for Radric Davis (p/k/a Gucci Mane). Except where I specifically

indicate that my knowledge is based on information and belief, I am fully familiar with the facts

set forth herein based on my review and analysis of relevant documents. I submit this

affirmation in response to the motion, by Order to Show Cause, of Big Cat Records, LLC. ("Big

Cat") which seeks an expedited hearing on its request for a Declaratory Judgment.

2.      At the outset, La Flare has no objection to an expedited hearing, provided that any

such hearing is set on a schedule that affords La Flare an opportunity to answer the complaint

and assert counterclaims for breach of contract, breach of fiduciary duty and copyright

infringement and allows a suitable opportunity for La Flare to conduct appropriate discovery.

3.    La Flare also agrees with Big Cat that this case primarily involves a matter of contract interpretation coupled with proper application of partnership law to the Joint Venture that consists of Big Cat and La Flare. However, contrary to Big Cat's assertions, when one properly considers the applicable agreements (the Joint Venture Agreement, Exhibit B to Big Cat motion; the Amendment to the Joint Venture Agreement, Exhibit C to Big Cat motion; and, the Atlantic Records/Big Cat Termination Agreement, Exhibit D to Big Cat motion), there are only two possible alternative results, both of which bar Big Cat from releasing and distributing any master recordings other than the two albums it released and distributed during the term of the Joint Venture Agreement:

5.    Alternative 1:  The respective rights and obligations of Big Cat and La Flare with respect to the assets of the joint venture (the master recordings) continue to be determined in accordance with the terms and conditions of the Joint Venture Agreement, as amended. The termination of the term of the Joint Venture Agreement simply ended the Joint Venture's right to obtain and distribute any additional master recordings of Gucci-Mane beyond the two albums it released during the term. If the Joint Venture Agreement is still applicable, then Big Cat has no right to release and distribute any master recordings that have not been selected and approved for release by La Flare in accordance with La Flare's exclusive rights under Paragraph 9 of the Joint Venture Agreement. Since it is undisputed that La Flare has not approved any master recordings for release and distribution other than those that were embodied on the two albums released during the term of the Joint Venture Agreement, Big Cat's contemplated distribution of additional albums and master recordings is in breach of La Flare's contractual rights and in breach of Big Cat's fiduciary duties as La Flare's joint venture partner.

6.    Alternative 2:  The respective rights and obligations of Big Cat and La Flare with respect to assets of the joint venture (the master recordings) are no longer determined under the terms of the Joint Venture Agreement between Big Cat and La Flare by virtue of the termination of the term of the Joint Venture Agreement.  If the Joint Venture Agreement no longer applies and the respective rights and obligations of Big Cat and La Flare to one another with respect to the joint venture's assets are not determined in accordance with the Joint Venture Agreement, then Big Cat has no entitlement to receive (and La Flare and Gucci-Mane have no obligation to issue) mechanical licenses to manufacture and distribute recordings of musical compositions written by Gucci-Mane.  Big Cat's right to obtain such licenses (and La Flare's obligation to provide such licenses) arise only under the provisions of the Joint Venture Agreement.

7.    Big Cat is fully aware that under either of the foregoing scenarios, it has no right to release the album of Gucci-Mane master recordings that it apparently contemplates releasing. Because the relevant agreements do not permit any other result, Big Cat has simply elected to misrepresent the mechanical license provisions of the Joint Venture Agreement (and the Amendment), pretending that instead of being an executory contractual obligation that may be enforced only if the Joint Venture Agreement continues to govern the relationship of the parties, it was a self-executing grant of rights effected during the term of the Joint Venture.  As I will show below, Big Cat selectively quotes part of the mechanical license provision, purposefully omitting the *in futuro* executory contractual obligation language.

8.    Big Cat refers to the Copyright Act and contends that as a co-owner of the copyrights in the master recordings (which are not identified), it has the right to exploit them, subject to a duty to account to the co-owner (and subject, of course, to having obtained mechanical licenses for the compositions embodied on the recordings).  Big Cat's argument in

3

this regard would be correct in the absence of an agreement that otherwise defines and limits the parties' rights and obligations with respect to the co-owned recordings. Here, however, while Big Cat may co-own with La Flare certain master recordings and the copyrights therein, it is undisputed that Big Cat acquired its rights in such master recordings pursuant and subject to the terms of the Joint Venture Agreement. Consequently, its rights and obligations with respect to such master recordings are determined not under the Copyright Act but under the agreement by which Big Cat acquired its rights, the Joint Venture Agreement. While the term of the Joint Venture Agreement may have ended pursuant to the termination agreement (Exhibit D to Big Cat's motion), the rights and obligations of the Joint Venturers (Big Cat and La Flare) with respect to Joint Venture property (the master recordings) continue to be defined in accordance with the Joint Venture Agreement.

9.    It is undisputed that La Flare has not authorized the release and distribution of the album that Big Cat apparently intends to release next week. It is equally undisputed that La Flare has not approved the artwork for this album. The right to determine the contents of any album (what master recordings may be released and distributed) and the right to determine the artwork of any album are vested exclusively under paragraph 9 of the Joint Venture Agreement in La Flare. Consequently, contrary to Big Cat's assertions, its contemplated release of any album and any master recordings not authorized by La Flare is at least a breach of contract and is undoubtedly also a breach of Big Cat's fiduciary duty to La Flare.[1]

10.    So that this Court is not left with the false impression that La Flare (or Atlantic Records) have unduly and intentionally delayed putting Big Cat on notice of their objections to

---

[1] While La Flare very much wishes to litigate this matter in this Court, it is not clear to La Flare that this Court has subject matter jurisdiction. Big Cat purports to base jurisdiction on the Copyright Act as there is no diversity between La Flare and Big Cat. But this case appears to turn not on the Copyright Act but on issues of state contract and partnership law.

its actions, as shown in the accompanying affidavit of Michael Kushner of Atlantic Records,

contrary to the claims of Big Cat, with the exception of a single master recording, Atlantic

Records did not know that Big Cat had any unreleased masters recorded by Gucci Mane.

Further, as Mr. Kushner's affidavit also makes clear, Atlantic Records certainly understood that

Big Cat was out of the "Gucci Mane business" upon execution of the termination agreement

(Exhibit D to Big Cat's motion). That is precisely why Atlantic was willing to make a very

significant payment to Big Cat ($300,000) and provide it with an override royalty on Atlantic

Record's first Gucci Mane album.[2]

11.    I also wish to point out that my initial letter to Big Cat was sent both by facsimile

and first class mail on August 24, 2007, a month ago. My first letter is attached to Big Cat's

motion as Exhibit E.[3] Big Cat thus had ample time to respond to my letter and to bring an action

if it wished a speedy determination of its rights. Instead, it did not bring this action until

virtually on the eve of its contemplated release. It now wishes to obtain an expedited

determination precisely because it belatedly recognizes that it has a considerable business and

legal risk if it releases an album that it has no right to release.

---

[2] Big Cat points to the absence of any provision precluding Big Cat from putting out any previously unreleased Gucci Mane master recordings. But given that Atlantic Records understood that Big Cat was getting out of the Gucci Mane business and that he would not be recording any additional master recordings for them, there would be no reason for such a provision. Equally important, it would be absurd for Atlantic Records to be paying Big Cat significant monies and an override royalty if it understood and intended that it was going to then be competing with Big Cat in the Gucci Mane business.

[3] Mr. Levy responded to my initial letter on August 31, 2007. Not atypically, certain of his assertions caused me to revisit my analysis of the relevant agreements and resulted in my second letter on September 7, 2007. I have continued to review the agreements and have concluded that while Mr. Levy and I disagreed about the agreements, neither of us were completely correct in our analyses. While I initially believed that the termination of the term of the Joint Venture Agreement terminated the joint venture, I have since concluded that both the Joint Venture continued with respect to the joint venture's assets and that the Joint Venture Agreement continues to govern the parties' rights and obligations with respect to those assets. In fact, my September 7, 2007 letter provides the same analysis as is set forth herein respecting both La Flare's right to decide what recordings would be released and distributed and the alleged obligation to issue mechanical licenses.

12.    Finally, I think it is also important to point out that in my initial letter of August 24, 2007, because we lacked any knowledge as to what master recordings Big Cat intended to release, we asked for confirmation that Big Cat was not going to be releasing and distributing previously unreleased master recordings. To this day, Big Cat has not addressed my inquiry. We still do not know what masters are contained on this contemplated album.

13.    Equally important, Big Cat has brought this action demanding an expedited determination of its claimed rights in master recordings without bothering to identify what those master recordings are. It has not identified when these master recordings were created and where they were created. It has not identified from whom it acquired these master recordings and when they were acquired. In short, Big Cat want this Court to issue a declaration as to its rights in an unknown body of master recordings.[4] And, at the same time, it claims to have obtained mechanical licenses for such unidentified master recordings when Gucci-Mane, the writer of such compositions has no idea what compositions have been embodied on such master recordings.

## THE JOINT VENTURE AGREEMENT AND THE TERMINATION OF ITS TERM

14.    It is undisputed that La Flare (and Radric Davis) entered into a Joint Venture Agreement with Big Cat dated as of January 20, 2005, a copy of which is attached to Big Cat's motion as Exhibit B. It is also undisputed that the parties amended the Joint Venture Agreement on June 3, 2005, a copy of which is attached to Big Cat's motion as Exhibit C. The amendment modified paragraphs 3 and 13 of the Joint Venture Agreement and specifically provided that,

---

[4] The impropriety of this request is compounded by the fact that, according to information my clients have obtained, Big Cat has remixed and combined different master recordings, thereby creating entirely new master recordings that were not even created by Gucci-Mane during the term of the Joint Venture Agreement. Thus, even were Big Cat to identify recordings by name, that would not necessarily enable La Flare and Gucci-Mane to determine what those master recordings are and when and where they were created.

"Except and to the extent amended and modified pursuant to this Amendment, the Agreement [the Joint Venture Agreement] shall remain in full force and effect."

15.     Paragraph 1 of the Joint Venture Agreement (which remained in full force and effect following the amendment) provided as follows:

> 1.   Purpose: **Company [Big Cat] and Venture Partner [La Flare] agree to 'joint-venture' the worldwide distribution of master recordings ('Masters') of the recording artist, Radric Davis, p/k/a 'Gucci-Mane' ('Artist').** Venture Partner will perform A&R services and provide fully-recorded and mixed 'first-class' Masters featuring the performances of Artist. Company will provide distribution, marketing, promotion and artist-development services. (Emphasis supplied.)

16.     Paragraphs 6 and 7 further defined the respective functions of Big Cat and La Flare with respect to the fulfillment of the purpose of the Joint Venture (the distribution of Gucci-Mane master recordings). Under Paragraph 6, La Flare would be responsible for paying all recording costs and fulfilling obligations to the Artist (Gucci-Mane).[5] Under Paragraph 7, Big Cat would provide promotion, marketing, artist development and administrative resources to the Joint Venture (for a fee) and would provide manufacturing and distribution functions to the Joint Venture for a fee.

17.     Paragraph 13, consistent with Paragraphs 6 and 7 (and the purpose of the Joint Venture as stated in Paragraph 1), provided that La Flare would license the Gucci-Mane master recordings to Big Cat (for distribution by Big Cat on behalf of the Joint Venture) during the Term of the Joint Venture Agreement and for a sell-off period of one year after the Term.

---

[5] Because this provision (and others) were not altered by the amendment, I believe that the amendment, which conveyed co-ownership of the master recordings rather than a license (which was what the Joint Venture Agreement provided) may not have been supported by consideration. Big Cat contends that the amendment was because it was paying recording costs. Gucci-Mane has denied that this was the case and claims that he has not been paid by Big Cat. This issue remains to be developed as this case proceeds.

18.    The "Term" of the Joint Venture Agreement was originally limited in accordance with Paragraph 3 (one of the provisions modified by the Amendment). Paragraph 3 originally provided as follows:

> 3. <u>Term/Album Commitment:</u> Three and one-half (3 ½) years per Album. One (1) initial Album entitled "So Icey" with the first Single also entitled "So Icey" plus Company [Big Cat] shall have the right (but not the obligation) to option an additional Album (two(2) Albums in total).

19.    Thus, the "Term" of the Joint Venture Agreement was originally defined by reference to the number of albums multiplied by 3 ½ years (for a maximum of 7 years). Upon the expiration of the Term of the Joint Venture Agreement, however, the Joint Venture would not end. Indeed, under Paragraph 13, as noted above, the license granted to Big Cat to distribute on behalf of the Joint Venture would enable it to sell off albums for a year after the Term ended.

20.    Paragraph 13 and Paragraph 3 were the two paragraphs of the Joint Venture Agreement modified by the Amendment. The Amendment altered the license granted Big Cat in Paragraph 13 to a co-ownership of the master recordings. Insofar as it pertains to the license provided under Paragraph 13, the Amendment provided as follows:

> <u>Paragraph 13</u> previously entitled, <u>Exclusive License</u>, shall be deleted and replaced with the following provision: <u>Ownership of Masters.</u> Venture Partner [La Flare] **hereby assigns, transfers, conveys and sells to Company** [Big Cat] an undivided fifty (50%) percent interest in all of Venture Partner's right, title and interest in all Master Recordings by Artist. (Emphasis supplied.)[6]

---

[6] I will address the balance of this provision (the mechanical license provision that is misrepresented by Big Cat in its motion) when I explain why Big Cat's contemplated release is without any mechanical license from the owner of the musical compositions (Gucci-Mane) and will therefore be copyright infringement. However, in anticipation of addressing this issue, I have purposefully highlighted the phrases **"hereby assigns"** above to juxtapose it with the quite different language relating to the mechanical license provision of the same paragraph of the amendment (**"agrees to deliver"**).

21.     The amendment also altered the Term of the Joint Venture Agreement by deleting the reference to its durational limit of 3 ½ years per album and extended the number of options provided to Big Cat under Paragraph 3. The Amendment provided as follows:

> Paragraph 3 shall be amended to read as follows:  Term/Album Commitment  One (1) initial Album entitled "So Icey" with the first Single also entitled "So Icey" plus Company [Big Cat] shall have the Right (but not the obligation) to option three (3) additional Albums (four (4) Albums in total).

22.     Thus, consistent with the fact that Big Cat would now be a co-owner of the master recordings rather than a licensee, the duration of the term of the Joint Venture Agreement was no longer denominated in a number of years multiplied by a number of possible albums. Big Cat obtained the right to obtain two additional albums to distribute on behalf of the Joint Venture (limiting the Joint Venture to the distribution of four albums) but the duration of the term of the Joint Venture Agreement with respect to these four potential albums (or fewer albums if not all options were exercised) was effectively co-extensive with the life of copyright of the master recordings. The previous 3 ½ year time duration of the term of the Joint Venture Agreement per album was eliminated by the Amendment.

23.     Consistent with the new duration of the Term of the Joint Venture Agreement with respect to the Joint Venture's assets (which under the Amendment was defined solely by reference to the number of albums the Joint Venture distributed, which in turn was based on the number of options exercised by Big Cat under the Joint Venture Agreement), when the Atlantic Records/Big Cat Termination Agreement was entered into (Exhibit D to Big Cat motion), it did not purport to terminate either the Joint Venture or the Joint Venture Agreement. Rather, it simply terminated the term of the Joint Venture Agreement. The Termination Agreement then explained that according, by virtue of the termination of the term, Big Cat waived any and all

9

further rights it had to the recording services of Gucci-Mane and neither La Flare or Gucci-Mane would have any further obligation to record, produce or deliver recordings to Big Cat. In short, the termination eliminated any further options that Big Cat had under the Joint Venture Agreement. It ended Big Cat's right to release any additional albums beyond the two albums it had theretofore released. However, the termination of the Term did not, in words or in effect, eliminate the respective obligations and rights of Big Cat and La Flare to one another under the Joint Venture Agreement with respect to the two albums that the Joint Venture had already distributed. Nor did it extinguish the explicit contractual conditions under which any other master recordings had been created.

24.    This brings me to Paragraph 9 of the Joint Venture Agreement, which remained unchanged and in full force and effect following the amendment of the Joint Venture Agreement. Paragraph 9 is perhaps the most critical paragraph of the Joint Venture Agreement as it pertains to this dispute. Consistent with the division of functions between Big Cat and La Flare expressed in paragraphs 6 and 7 of the Joint Venture Agreement (and consistent with the stated purpose of the Joint Venture Agreement which originally contemplated that La Flare would pay for the production of the master recordings and solely own them and license them to Big Cat to distribute them on behalf of the Joint Venture), paragraph 9 provides as follows:

> 9.    Marketing/Budgetary/Procedure.  Company [Big Cat] shall consult with Venture Partner [La Flare] on all marketing/promotion/budgetary decisions. Provided, in the event of a dispute, Company's good faith decision shall prevail. **Venture Partner [La Flare] shall have creative control with respect to: A&R, artwork, video concept and storyboard and musical direction of Artist.** (Emphasis supplied.)

25.    This provision is clear and unambiguous. Simply stated, consistent with the fact that the Joint Venture Agreement originally contemplated that La Flare would be responsible for

paying for the recording sessions and paying the Artist, paragraph 9 vested La Flare with

exclusive control over the master recordings, the content of any and all albums and what

recordings would be made available to be released and distributed.

26.     La Flare's exclusive control over Gucci-Mane's repertoire and artistic direction

(which is control over what recordings would be made available for distribution) did not mean

that Big Cat was obligated to manufacture and distribute on behalf of the Joint Venture any and

all recordings La Flare chose to make available.  Rather, as noted above, paragraph 3 of the

Agreement, as modified by the Amendment, only required the distribution of the first album "So

Icey" and provided Big Cat with options for three (3) additional albums.  If Big Cat did not like

the recordings that La Flare proposed to have distributed on behalf of the Joint Venture (or if any

of Gucci-Mane's albums proved insufficiently unsuccessful), Big Cat could elect not to exercise

its option.  In the event that options were not exercised, the obligation to provide additional

albums would come to an end (freeing Gucci-Mane and La Flare to offer his recording services

elsewhere) but the existing albums (the initial album and any albums for which options had been

exercised by Big Cat) would still be distributed and exploited under and pursuant to the Joint

Venture Agreement.  And, critically for this case, any unreleased master recordings, while co-

owned by Big Cat and La Flare, could no longer be released and distributed (or, only distributed

in accordance with the requirements of the Joint Venture Agreement, including paragraph 9

thereof).[7]

---

[7] In the context of the Joint Venture Agreement, Big Cat's position makes no sense.  Its unexercised options were
terminated by the termination agreement.  Yet it conceives that by virtue of the Atlantic Records/Big Cat
Termination Agreement, for which it was paid a $300,000 advance, it is now free to release and distribute even more
albums than it was entitled to distribute under the Joint Venture Agreement precisely because it is now supposedly
free of the strictures of the Joint Venture Agreement.  Instead of a Joint Venture for up to four albums, now Big Cat
can supposedly distribute an unlimited number of albums and do so free of any restrictions of the Joint Venture
Agreement.  If this position were correct, Big Cat should have paid Atlantic Records for the termination.

27.     While the Amendment modified the Joint Venture Agreement to provide Big Cat with co-ownership of La Flare's interest in Gucci-Mane's recordings, it did not alter Paragraph 6, which required La Flare to pay for the recording sessions and to pay the Artist and it did not alter Paragraph 9 which vested La Flare with exclusive control over what recordings would be made available for distribution and vested La Flare with exclusive control over album artwork.

28.     It is undisputed that the sole basis on which Big Cat claims any ownership rights in any Gucci-Mane master recording is through the co-ownership rights granted to it pursuant to the Joint Venture Agreement, as amended by the Amendment.  It is equally undisputed that this claim of co-ownership only applies to master recordings allegedly recorded during the term of the Joint Venture (there is no other basis on which it could have acquired any ownership interest in any master recordings).  Thus, every one of the master recordings must, of necessity, have been created under and pursuant to the terms of the Joint Venture Agreement and constitutes property of the Joint Venture.[8]

29.     The issue then squarely presented is what happens to the respective rights and obligations of the parties to one another with respect to the assets of the joint venture upon the termination of the Term of the Joint Venture Agreement?  Do they cease to exist or do their respective rights and obligations with respect to partnership property (the master recordings) continue to be defined in accordance with the agreement under which they acquired their rights in the property?  Consistent with the language of the agreements, I believe that the answer is that while the term of the joint venture agreement may have ended (meaning the right to obtain and distribute additional albums), the joint venturers' rights in the assets of the joint venture, unless

---

[8] Again, I note that Big Cat has failed to identify what master recordings are at issue herein.  It has not even identified the master recordings on the album it intends to release and distribute next week.

and until the joint venture is dissolved and liquidated, continue to be determined in accordance with the Joint Venture Agreement.

30.    As noted above, the joint venture property (the master recordings) are subject to specific agreements between Big Cat and La Flare that determine which of them have what rights with respect to the use and exploitation of the joint venture property.  Big Cat has elected to avail itself of the ownership rights in the master recordings granted to it under the Joint Venture Agreement but it wishes to ignore the restrictions and limitations on those rights of ownership explicitly provided by the same Joint Venture Agreement.  It conceives that it is free to take any and all master recordings allegedly created during the term of the Joint Venture Agreement and array them in any fashion it chooses, splicing and interpolating them in any fashion it chooses and release and distribute them without the consent and authorization of La Flare without regard to the exclusive rights vested in La Flare by the same Joint Venture Agreement.[9]

31.    While Big Cat appears unwilling to acknowledge that it has any continuing obligations or restrictions of its rights under the Joint Venture Agreement, this presents a critical problem for Big Cat with regard to how it purports to have obtained any mechanical licenses permitting it to embody any compositions on its contemplated album.  As I have said, while La Flare does not know what recordings are on the contemplated album, it appears that it includes recordings of compositions that have either not been previously released or which, having been interpolated from various compositions, constitute derivative works.  In either case, Big Cat requires mechanical licenses from the owner of the compositions.  It is my understanding that the owner of the compositions is Gucci-Mane and or his publishing company.

---

[9] Indeed, as I indicated, La Flare has heard that Big Cat has spliced together pieces of various master recordings that Gucci-Mane was working on during the term of the Joint Venture Agreement to create entirely new master recordings that were never created by him during the term.

32      So where does Big Cat found its right to have obtained such mechanical licenses? According to its motion, it was supposedly granted mechanical licenses under the Joint Venture Agreement, as amended.  It appears that Big Cat is claiming that the mechanical licenses were actually already issued under the Joint Venture Agreement during the term (before the term was terminated).  Unfortunately, because the language of the Joint Venture Agreement (and logic) does not support such an assertion, Big Cat is reduced to simply misrepresenting the language of the Joint Venture Agreement.

33.     As I noted above, the Amendment modified Paragraph 13 of the Joint Venture Agreement from a license to co-ownership.  It expressly stated that La Flare "**hereby assigns, transfers, conveys and sells…..**"  In the very same paragraph of the Amendment, with respect to mechanical licenses, it states as follows:

> Venture Partner [La Flare] **agrees to deliver to Company** [Big Cat] all necessary assignment of copyrights, **mechanical licenses,** label copy, copyright information, 'sample clearances' and other information required to manufacture, market, distribute, and sell records.

34.     The distinction between the two provisions is clear.  Whereas the assignment of co-ownership of the master recordings was immediately effected (**hereby assigns**), the right to obtain mechanical licenses was an executory contractual obligation to be performed in the future (**agrees to deliver**).  It was not self-executing.  Rather, it was an obligation created by the Joint Venture Agreement and enforceable only under and pursuant to the Joint Venture Agreement.

35.     As I have said, Big Cat has purposefully misrepresented this provision.  On page 5 of Mr. Levy's affidavit, he carefully eliminates the "**agrees to deliver**" language and instead substitutes, outside the quoted language of the provision itself, that La Flare "**grants**" the mechanical licenses.  Thus, his affidavit states as follows:

>Thus, in paragraph 16(a) of the 2005 Joint Venture Agreement, and again in paragraph 2 of the June 3, 2005 amendment, **La Flare grants to Big Cat Records 'all necessary assignments of copyrights, mechanical licenses…..'"**    (Emphasis supplied.)

36.     As shown above, contrary to Mr. Levy's affidavit and Big Cat's assertions, there was no currently executed grant of any mechanical licenses.  Rather, both under the original Joint Venture Agreement and the Amendment (the language is the same), La Flare "agrees to deliver" mechanical licenses.

37.     The executory *in futuro* nature of this contractual obligation is fully consistent with reality and logic.  Until there is a recording that is going to be released, there is nothing to mechanically license.  As I understand it, during the term of the Joint Venture Agreement, Big Cat distributed two albums (the first album and having exercised one option, a second album) on behalf of the Joint Venture.  In accordance with its contractual obligations, mechanical licenses were issued for the recordings on these albums.

38.     However, the new album that Big Cat contemplates now releasing and distributing was not issued mechanical licenses prior to the termination of the term of the Joint Venture Agreement (because Big Cat never exercised an option for such Album before its option rights were extinguished by the Atlantic Records/Big Cat Termination Agreement).  The only way Big Cat can possibly obtain such mechanical licenses now is if Gucci Mane or La Flare are subject to an enforceable contractual obligation to issue mechanical licenses.

39.     But as a matter of law, it is clear that if La Flare or Gucci-Mane remain contractually obligated to deliver such mechanical licenses (after the termination of the term of the Joint Venture Agreement), such obligation can only exist if all of the rights, obligations and limitations of the Joint Venture Agreement, as amended, continue to govern the relationship of Big Cat, La Flare and Gucci-Mane with respect to joint venture assets (which is precisely what

15

La Flare contends). But if the Joint Venture Agreement continues to govern the rights and obligations of the parties, then Big Cat has no right to put out any album or any master recordings without the authorization of La Flare in accordance with paragraph 9 of the Joint Venture Agreement. Big Cat cannot pick and choose among the provisions it wishes to have enforced and applied and those it prefers to ignore.

40.    Thus, Mr. Levy is correct that Big Cat is between Scylla and Charybdis. It can only release its album if it has mechanical licenses. But it cannot get mechanical licenses except under the Joint Venture Agreement. But if the Joint Venture Agreement exists such that it can get mechanical licenses, then all of the provisions of the Joint Venture Agreement continue to govern the parties' relationship and Big Cat cannot release the album without the authorization of La Flare pursuant to paragraph 9 and it lacks that authorization. Either way, Big Cat has no right to release any albums other than the albums it has already released.

41.    Alternatively, if Big Cat insists that the Joint Venture Agreement does not continue to govern their relationship respecting joint venture assets, then Big Cat has no entitlement to mechanical licenses and La Flare and Gucci-Mane have no continuing contractual obligation to deliver such mechanical licenses to Big Cat. In which event, Big Cat's contemplated album will infringe the Gucci-Mane's copyrights in the compositions embodied on such recordings.

42.    Finally, beyond Big Cat's failure to identify what masters are supposedly involved in this lawsuit, I believe its motion suffers from a further defect which further supports La Flare's position that the Joint Venture Agreement continues to apply to all joint venture property. Nowhere in its motion does Big Cat offer any explanation of the basis on which it may continue to distribute (or re-release) the albums that it did release during the term of the Joint

Venture Agreement. Did the agreement also cease to exist as to those albums? Did the Joint Venture cease to exist. If so, on what basis and for whose account is Big Cat currently distributing those albums? Can it alter the approved artwork for those albums? Did its financial obligations to La Flare with respect to those albums immediately change on November 16, 2006 when the term of the Joint Venture Agreement was terminated? If so, what did its obligations change to?

43.    I respectfully submit that Big Cat's position in this action is illogical and refuted by the relevant agreements. Big Cat either has no right to distribute any albums other than those it distributed during the term of the Joint Venture Agreement without the explicit authorization of La Flare pursuant to paragraph 9 of the Joint Venture Agreement (and I believe that consistent with the Atlantic Records/Big Cat Termination Agreement, to which La Flare and Gucci-Mane were parties, La Flare has no right to authorize Big Cat to release and distribute any further albums) or La Flare has no obligation to issue any mechanical licenses to Big Cat permitting it to exploit any previously unreleased compositions or derivative works and any release of any recordings containing such compositions would be infringing.

44.    In either event, Big Cat has no right to release and distribute any additional recordings other than those it released and distributed during the term of the Joint Venture Agreement. Its contemplated release of a new album will therefore either constitute a breach of the Joint Venture Agreement and a breach of its fiduciary duty to La Flare (and to Gucci-Mane) or it will infringe the copyright compositions written by Gucci-Mane.

45.    For all of the foregoing reasons, while La Flare has no objection to an expedited hearing, assuming that Big Cat can properly establish this Court's subject matter jurisdiction, I

submit that La Flare will be and is entitled to a declaratory judgment that Big Cat's contemplated

release is in violation of its rights and, assuming that Big Cat perseveres with its release, to

damages.

Dated: New York, New York
         September 20, 2007

                                          _____
                                                Donald S. Zakarin