UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BIG CAT RECORDS, LLC,

Plaintiff,

-against-

La FLARE ENTERTAINMENT, LLC,

Defendant.

07 Civ. 8161 (BSJ)

## DECLARATION OF MICHAEL KUSHNER

MICHAEL KUSHNER declares the following under 28 U.S.C. § 1746:

1.    I am Executive Vice President, Business & Legal Affairs at Atlantic Recording Corporation ("Atlantic") and submit this Declaration in support of LaFlare Entertainment, LLC's ("LaFlare") response to the motion, by Order To Show Cause, of Big Cat Records, LLC ("Big Cat"). I have personal knowledge of all of the facts set forth in this Declaration and can and will testify as to their truth if called upon to do so.

The Termination Agreement

2.    Atlantic and Big Cat entered into an agreement dated as of November 16, 2006 (the "Termination Agreement"), the first numbered paragraph of which – entitled "**Termination of Big Cat Artist Agreement**" –expressly terminated the term of the agreement dated as of January 20, 2005, and any and all modifications, amendments and extensions thereof, between Big Cat and LaFlare for the recording services of Radric Davis, professionally known as "Gucci-Mane" (the "Big Cat Artist Agreement"). (Termination Agreement ¶ 1) The clearly stated purpose of the Termination Agreement was to allow Atlantic to enter into an agreement granting it "the rights to [Gucci-Mane's] exclusive recording services" (the "Atlantic Artist Agreement") and allowing it "to fully enjoy its rights thereunder." (Id. at 1, ¶ 1)

3.     As consideration for the termination of the Big Cat Artist Agreement, Atlantic agreed, among other things, to pay Big Cat (i) $300,000 upon the execution of the Termination Agreement and the Atlantic Artist Agreement (which amount Atlantic has since paid); (ii) $100,000 upon commencement of recording of a second album under the Atlantic Artist Agreement; and (iii) royalties on sales of the first album delivered to Atlantic under the Atlantic Artist Agreement.  (Id. ¶¶ 2(a)(i)-(ii), 3(a))

4.     As of the time of the Termination Agreement, Atlantic knew that Big Cat had released only two albums by Gucci-Mane, "Trap House" and "Hard To Kill."  Besides the sound recordings on those two albums and the sound recording "My Chain (Remix)" (the "Remix"), which is a re-worked version of a sound recording on the "Hard To Kill" album, Atlantic did not know – and was not told – that Big Cat had in its possession any sound recordings by Gucci-Mane that were not released on those albums (the "Unreleased Recordings").

The Affidavits Submitted By Big Cat

5.     I have reviewed the three Affidavits that Big Cat submitted in support of its request for Declaratory Judgment:  (i)  the Affidavit of Stewart L. Levy, Esq. executed on September 18, 2007 (the "Levy Aff."); (ii) the Affidavit of Thomas Silverman executed on September 17, 2007 (the "Silverman Aff."); and (iii) the Affidavit of Marlon Rowe executed on September 18, 2007 (the "Rowe Aff.").

6.     All three Affidavits state or suggest that Atlantic knew about the Unreleased Recordings at the time that the Termination Agreement was signed.  (Levy Aff. ¶ 9(a)(ii); Silverman Aff. ¶ 8; Rowe Aff. ¶ 17)  In fact, as set forth in paragraph 4 above, Atlantic had no such knowledge except with respect to the Remix.

7.     The Levy Aff. states that the Termination Agreement "is silent" on the issue of whether Big Cat could sell or otherwise exploit the Unreleased Recordings and the absence of any express provision prohibiting the company from doing so reflects the parties' intent that such sales and exploitations were permissible.  (Levy Aff. ¶¶ 6, 9(a)(ii))  These statements are incorrect for at least three reasons.

8.     First, Mr. Levy's statements are belied by the fact that, as noted in paragraph 3 above, Atlantic paid Big Cat hundreds of thousands of dollars and promised to pay Big Cat significant amounts of additional money in the future.  Atlantic undertook these obligations as consideration for Big Cat's agreement to get out of the Gucci-Mane business, not to bankroll an attempt by Big Cat to compete against Atlantic by releasing new recordings by this artist.

9.     Second, while it is certainly true that the Termination Agreement does not explicitly address the Unreleased Recordings, the manifest purpose of the agreement – and Atlantic's intent in entering into it – was to terminate Big Cat's rights to Gucci-Mane's services and to ensure that Atlantic did not have to contend with recordings by him released by another record label.  This purpose is apparent in, among other things, the fact that the Termination Agreement (i) expressly terminates the term of the Big Cat Artist Agreement; (ii) states that Big Cat "waives any and all rights it may have . . . to the recording services of [Gucci-Mane]"; and (iii) specifically is intended to allow Atlantic "to fully enjoy its rights [under the Atlantic Artist Agreement]."

10.     Third, the absence of any express provision concerning the Unreleased Recordings in the Termination Agreement is meaningless because there was no need for such a provision since the Big Cat Artist Agreement already prevented Big Cat from exploiting the Unreleased Recordings.  As explained in more detail in the Affirmation of Donald S. Zakarin

3

accompanying my Declaration, paragraph 9 of the Big Cat Artist Agreement confirms that Gucci-Mane (through LaFlare), not Big Cat, had complete control over, among other things, (i) which of his recordings could be released; and (ii) the packaging of any such releases. (See Big Cat Artist Agreement ¶ 9 ("[LaFlare] shall have creative control with respect to: A&R, artwork, video concept and storyboard and musical direction of [Gucci-Mane]") This paragraph, as well as industry practice, makes clear that "A&R" and "musical direction" control means that Big Cat cannot release any Gucci-Mane recordings without first obtaining Gucci-Mane's approval. Similarly, "artwork" control means that, before releasing any such recordings, Big Cat must secure Gucci-Mane's approval of album covers and other packaging used in the release.

11.    In addition, when read in tandem with Gucci-Mane's rights under paragraph 9 of the Big Cat Artist Agreement, the amended paragraph 13 of the agreement confirms that Big Cat did not receive an up-front mechanical license to exploit the musical compositions embodied in all Gucci-Mane sound recordings, but rather obtained a contractual entitlement to such a license solely for compositions contained in sound recordings approved for release by the artist.

12.    It was Atlantic's understanding at the time it entered into the Termination Agreement (and is so today) that the only recordings that Gucci-Mane ever authorized Big Cat to release are those on the "Trap House" and "Hard To Kill" albums and the Remix. It also was Atlantic's understanding at that time (and is so today) that the only mechanical licenses that Gucci-Mane ever granted to Big Cat were for those recordings as they appear on those albums and in the Remix.

13.    For the reasons explained in paragraphs 10 through 12 above, Atlantic (and Big Cat) had no need to address the Unreleased Recordings in the Termination Agreement.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on September 20, 2007.

_____
MICHAEL KUSHNER

80403826.2